**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| MICROSOFT CORPORATION, a Washington corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No: 1:19-cv-01582 (LO/JFA) |
| v. | ) ) | |
| JOHN DOES 1-2, CONTROLLING A COMPUTER NETWORK AND THEREBY INJURING PLAINTIFF AND ITS CUSTOMERS, | ) ) ) ) | |
| Defendants. | ) ) ) ) ) ) | |

**MEMORANDUM IN SUPPORT OF MICROSOFT'S MOTION FOR
DEFAULT JUDGMENT AND PERMANENT INJUNCTION**

## I.      INTRODUCTION

Plaintiff Microsoft Corporation ("Plaintiff" or "Microsoft") seeks a default judgment and permanent injunction to prevent Defendants John Does 1-2 from continuing to operate the malicious computer network infrastructure and Internet-based cybercriminal operation known as "Thallium." As set forth in Plaintiff's pleadings and the Court's previous orders, the Thallium infrastructure is comprised of Internet domains used to propagate and control the cybercrime operation, to infect end-user computers with malicious software ("malware") and to steal high-value, confidential and sensitive information from those end-user computers. Defendants have propagated and controlled the Thallium operation through Internet domains used to relay instructions to infected computers. In particular, Defendants have propagated and controlled the malicious infrastructure using domains that make deceptive use of Microsoft's trademarks and

brands.  Through this request, Plaintiff seeks to supplement the existing injunction with additional Thallium domains that have recently been discovered.  Further, Plaintiff seeks to bring this case to final conclusion by way of a permanent injunction that will prevent Defendants from continuing to propagate the Thallium operation or retaking control of that operation through abuse of Microsoft's trademarks and brands, once this case is closed.

Plaintiff requests an injunction (1) prohibiting Defendants from operating or propagating the Thallium infrastructure; (2) transferring control to Microsoft of known malicious Thallium domains; and (3) appointing a Court Monitor, pursuant to Federal Rule of Civil Procedure 53, to oversee Defendants' compliance with the permanent injunction, to increase the effectiveness of the permanent injunction and ensure prompt, continuous response to any continued violation of the permanent injunction by Defendants.  This injunctive relief is required to prevent further harm to Plaintiff and the general public that would be caused if Defendants are able to continue to propagate and retake control of the Thallium infrastructure using Thallium domains that abuse Microsoft's trademarks and brands.  A permanent injunction is the only way to afford relief and abate future harm in this case.  This is particularly the case, given that, in the absence of such relief, Defendants will certainly register new domains targeting Microsoft's trademarks and brands, use them to intrude upon Microsoft's Windows operating system and the computers of Microsoft's customers, grow and control the infrastructure, and steal high-value, confidential and sensitive information.  Indeed, as set forth below, such newly utilized domains have been discovered and are addressed in the proposed injunction, demonstrating the need for permanent and ongoing relief.

Plaintiff duly served Defendants with the Complaint and all pleadings and orders of the Court in this action in a manner consistent with Due Process and this Court's instructions.

Plaintiff served Defendants on December 24, 2020 and thereafter, by email and publication at the website http://www.noticeofpleadings.com/thallium/.  Defendants failed to respond and the Clerk of the Court entered default on August 27, 2020. Dkt. 36.  The factual allegations in the Complaint and the record in the case establish the elements of each of Plaintiff's claims and also establish the need for the requested injunctive relief.

## II.   FACTUAL BACKGROUND

This action arises out of violations of federal and state law caused by Defendants' operation of a harmful cybercriminal operation, known as "Thallium," carried out through harmful Internet domains.  Dkt. 14 (Declaration of David Anselmi in Support of TRO and Preliminary Injunction), ¶ 3.  Defendants' illegal conduct includes the infection of computing devices running software licensed from Microsoft, the deep and persistent compromise of computing networks, the theft of sensitive information from those networks, and the use of Microsoft's famous trademarks, services, and products in the course of disguising and conducting illegal activity.  Id. ¶¶ 7-25.

### Overview of Thallium

The group of Defendants known as "Thallium" specializes in targeting, penetrating, and stealing sensitive information from high-value computer networks connected to the Internet.  Id. ¶ 5.  They target Microsoft customers in both the private and public sectors, including businesses in a variety of different industries, government employees, organizations that work on Nuclear Proliferation issues, think tanks, university staff members, members of organizations that attempt to maintain world peace, human rights organizations and many other organizations and individuals.  Id.

Thallium hacks into a targeted user accounts and computer networks, with the objective

to obtain sensitive and confidential information from those sources.  *Id.* ¶¶ 6-25.  Thallium continues to pose a threat today and into the future, as is further discussed below, given that the Defendants continue to register domains to carry out attacks. *See id*.  The identity of the Defendants is unknown.  *Id.* ¶ 3.

After selecting a target organization, the Defendants will typically attempt to compromise the computers of the targeted individual through a technique known as "spear phishing."  *Id*.  ¶¶ 7-19.  In a typical spear phishing attack, Thallium sends the targeted individual an email specifically crafted so as to induce that individual to take some action that will lead to the compromise of their computer.  *Id*.  Thallium is able to craft the phishing email in a way that gives the email credibility to the target, often by making the email appear as if it was sent from an organization or person known to and trusted by the victim or concerning a topic of interest to the victim.  *Id*.  Thallium will patiently send a selected target numerous phishing emails over a long period of time until it achieves success.  *Id*.

Thallium's emails often include links to websites that Thallium has set up in advance and controls.  *Id*.  When the victim clicks on a link in the email, his or her computer is connected with the Thallium-controlled website.  *Id*.  That website contains software that is designed to probe the user's computer for vulnerabilities and then, upon finding a vulnerability, to download malware to the user's computer and infect it.  *Id*.  These domains are among those listed in **Appendix A** to the Proposed Default Judgment and Order for Permanent Injunction, submitted with this motion.  *Id.*

If Thallium is able to successfully compromise a user's computer, it then leverages this access to establish a hidden presence on the targeted network.  *Id.* ¶¶ 20-25.  To accomplish this, Thallium uses techniques that provide remote access over the Internet to computers on the

victim's network.  *Id*.  Defendants are thereafter able to remotely control the victims' systems.
*Id*.  Thallium uses the websites identified in **Appendix A** to the Proposed Default Judgment and
Order for Permanent Injunction in such command and control infrastructure.  *Id*.

After gaining a foothold on one computer within an enterprise network, Thallium
attempts to move laterally through the organization by compromising additional computers to
gain access to sensitive data and high-value individuals.  *Id.* ¶¶ 20-22.  Once secretly established
on the target network, Thallium will move to the exploitation phase of the attack during which
the group exfiltrates sensitive information from the victim's network.  *Id*.  This usually happens
through the infrastructure of websites or domains that Thallium has established on the Internet.
*Id.* ¶ 16.  Thallium attempts to disguise this traffic through domain names that are associated
with common tasks on the network, such as software updates and malware checks.  *Id*.  Overall,
Thallium tries to blend its activities, including exfiltration of data, into the normal network traffic
so as to avoid tripping intrusion detection sensors or arousing suspicion of network security
administrators.  *Id.*

### The Court's Injunctions, Defendants' Disregard Of The Injunctions, And Defendants' Continued Harmful Activities Through The Course Of This Case

On December 18, 2019, the Court entered a TRO that disabled the Thallium Defendants'
existing active domains used to deceive victims and as command and control infrastructure, as
discussed above.  Dkt. 19.  The Court subsequently entered a Preliminary Injunction disabling
the same domains.  Dkt. 28.  Defendants have now ignored those orders and put into operation a
number of new domains to control the Thallium infrastructure.  Indeed, Defendants, who are
evidently resourceful and well-funded, continue to try to maintain and reestablish new command
and control domains and other command and control infrastructure so that they can continue
their illegal activities.

Recent evidence shows that Defendants are again rebuilding Thallium's command and control infrastructure by adding new domains.  A list of the new domains used by Defendants is provided in Appendix A to the Proposed Permanent Injunction filed concurrently with this brief. The domains added to Appendix A are contained under the heading "NEW DOMAINS TO BE ADDRESSED THROUGH PERMANENT INJUNCTION."  Declaration of David Anselmi in Support of Default Judgment and Permanent Injunction, ¶¶ 3-5 (Ex. 1).  These domains are used for the same harmful purposes as the domains previously addressed in prior orders.  *Id*.  The domains are utilized solely to steal credentials, install malware and to ultimately exfiltrate personal, sensitive or confidential information from accounts and computers.  *Id*.  These activities violate the Court's prior orders, and violate the law for the same reasons set forth in the prior submissions and in the prior injunctions.  These activities harm and threaten to continue the cause irreparable harm.  *Id*.  The only way to mitigate the harm caused by these domains is to transfer them to the control of Microsoft and to transfer control away from Defendants.  *Id*. Accordingly, as part of the relief sought herein, Microsoft seeks control over these newly utilized domains.

Microsoft seeks to supplement the prior injunction orders by including the foregoing domains listed at Appendix A to the Proposed Permanent Injunction submitted with this motion. This will allow Microsoft to disrupt Defendants more recent illegal activity.  Such supplemental relief has been granted in prior cases when defendants began using new domains after the court granted a temporary restraining order.  *See Microsoft Corp. v. John Does 1-8*, Case No. l:14-cv-00811-LOG-TCB (E.D. Va. 2014) (O'Grady, J.) at Dkt. No. 32 (disabling the "Shylock" botnet). Thus, pursuant to Federal Rule of Civil Procedure 65, disabling that infrastructure is necessary to prevent harm to Microsoft and its customers.

Unfortunately, the Defendants ignored the Court's directives in the Preliminary Injunction.  Since that time, Defendants have again put into operation new domains to control the Thallium infrastructure, which domains specifically made deceptive use of general computing terms as well as content using Microsoft's trademarks and brands.  The Defendants have ignored the Court's prior orders and are now persistently putting into operation new domains to control the Thallium infrastructure.

There is evidence that Defendants' disregard of Court's orders is knowing and intentional and that Defendants will continue to flout the Court's injunctions.  First, Defendants have received service of process and repeated notice of the Court's injunctions.  Dkt. 35.  Second, after Defendants' infrastructure was disabled and Defendants were directed to cease their activities the Defendants registered new Thallium domains that either contain general purpose terms used to target Microsoft customers and infrastructure or contain content leveraging the Microsoft trademarks and brands for the same purpose.  Anselmi Decl., ¶ 5.  This indicates that Defendants intentionally have and are likely in the future to intentionally violate any permanent injunction.

In the foregoing injunction orders, and consistent with the unrebutted allegations in the Complaint, the Court has made several factual findings and conclusions of law.  Among other findings, the Court concluded that:

- The Court has jurisdiction;

- Defendants have used and have continued to use domains identified by Plaintiff throughout this case to control the Thallium infrastructure;

- Defendants have used and continue to use domains containing Microsoft's trademarks and brands to deceive victims and control the Thallium infrastructure;

- Defendants activities concerning the domains has violated or is likely to violate the Computer Fraud and Abuse Act (18 U.S.C. § 1020), Electronic Communications Privacy Act (18 U.S.C. § 2701), the Lanham Act (15 U.S.C. §§ 1114, 1125), the

Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)), and the common law doctrines of trespass to chattels, conversion, and unjust enrichment;

- Unless enjoined, Defendants are likely to continue to engage in conduct that violates the Computer Fraud and Abuse Act (18 U.S.C. § 1020), Electronic Communications Privacy Act (18 U.S.C. § 2701), the Lanham Act (15 U.S.C. §§ 1114, 1125), the Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)), and the common law doctrines of trespass to chattels, conversion, and unjust enrichment;

## III.   <u>LEGAL STANDARD</u>

Rule 55 of the Federal Rules of Civil Procedure authorizes the entry of a default judgment when a defendant fails to plead or otherwise defend in accordance with the Federal Rules. *Tweedy v. RCAM Title Loans, LLC*, 611 F. Supp. 2d 603, 605 (W.D. Va. 2009) (citing *United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982)). The Clerk's interlocutory "entry of default" pursuant to Federal Rule of Civil Procedure 55(a) provides notice to the defaulting party prior to the entry of default judgment by the court. In turn, Federal Rule of Civil Procedure 55(b)(2) "authorizes courts to enter a default judgment against a properly served defendant who fails to file a timely responsive pleading." *LPS Default Solutions, Inc. v. Friedman & MacFadyen, P.A.*, 2013 U.S. Dist. LEXIS 108486, at *2-3 (D. Md. Aug. 2, 2013). Default judgment is appropriate when the adversary process has been halted because of an unresponsive party. *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005). Upon default, the well-pled allegations in a complaint as to liability are taken as true. *Id.* Here, the Clerk has entered Defendants' default under Rule 55(a) (Dkt. 36), and Defendants have received notice of the same.

In reviewing motions for default judgment, courts have referred to the following factors: (1) the amount of money involved in the litigation; (2) whether there are material issues of fact in the case needing resolution; (3) whether the case involves issues of great public importance; (4) whether the grounds for the motion for a default judgment are highly technical; (5) whether the

party asking for a default judgment has been prejudiced by the non-moving party's actions or omissions; (6) whether the actions or omissions giving rise to the motion for a default judgment are the result of a good-faith mistake on the part of the non-moving party; (7) whether the actions or omissions giving rise to the motion for a default judgment are the result of excusable neglect on the part of the non-moving party; and (8) whether the grounds offered for the entry of a default judgment are clearly established. *Tweedy*, 611 F. Supp. 2d at 605-606 (citing *Faulknier v. Heritage Financial Corp*., 1991 U.S. Dist. LEXIS 15748 (W.D. Va. May 20, 1991) and 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §§ 2684-85 (1990)).

Courts may order permanent injunctive relief in conjunction with default judgments. *E.g.*, *Trs. of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation, Inc*., 2011 U.S. Dist. LEXIS 124337, at *12 (D. Md. Oct. 27, 2011) (collecting cases). Permanent injunctions depriving cybercrime defendants of their malicious infrastructure, on an ongoing basis in the future, have been entered by this Court in connection with entry of default judgments. *See America Online v. IMS*, 1998 U.S. Dist. LEXIS 20645 (E.D. Va. Dec. 30, 1998) (Brinkema, J.); *Microsoft Corp. v. Doe*, 2015 U.S. Dist. LEXIS 109729 (E.D. Va. Aug. 17, 2015) (O'Grady, J.); *Microsoft Corp. v. Doe*, 2015 U.S. Dist. LEXIS 110145 (E.D. Va. July 20, 2015) (Report and Recommendation); *Microsoft Corp. v. Doe*, 2014 U.S. Dist. LEXIS 46951 (E.D. Va. Apr. 2, 2014) (Brinkema, J.); *Microsoft Corp. v. Doe*, 2014 U.S. Dist. LEXIS 48398 (E.D. Va. Jan. 6, 2014) (Report and Recommendation); *see also Microsoft Corp. v. Does*, 2013 U.S. Dist. LEXIS 168237 (W.D.N.C. Nov. 21, 2013)

## IV.   DISCUSSION

### A.   Due Process Has Been Satisfied

Plaintiff has served the Complaint, Summons, and all orders and pleadings on Defendants

using the methods ordered by the Court under Rule 4(f)(3), including service by email and publication. It is well settled that legal notice and service by email, facsimile, mail and publication satisfies Due Process where these means are reasonably calculated, in light of the circumstances, to put defendants on notice. *See, e.g., FMAC Loan Receivables v. Dagra,* 228 F.R.D. 531, 534 (E.D. Va. 2005) (acknowledging that courts have readily used Rule 4(f)(3) to authorize international service through non-traditional means, including email); *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950) (discussing Due Process requirements). Email service and Internet publication are particularly appropriate here given the nature of Defendants' conduct and use of email as the primary means of communication in connection with establishing and managing the IP addresses and domains used to operate the Thallium domains and infrastructure. *FMAC Loan Receivables,* 228 F.R.D. at 534; *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014-15 (9th Cir. 2002) ("[Defendant] had neither an office nor a door; it had only a computer terminal. If any method of communication is reasonably calculated to provide [Defendant] with notice, surely it is email…"); *BP Prods. N. Am., Inc. v. Dagra*, 236 F.R.D. 270, 271-273 (E.D. Va. 2005) (approving notice by publication in two Pakistani newspapers circulated in the defendant's last-known location); *Microsoft Corp. v. John Does 1-27,* Case No. 1:10-cv-156 (E.D. Va. 2010, Brinkema J.) at Dkt. 38, p. 4 (authorizing service by email and publication in similar action).

In this case, the email addresses provided by Defendants to the domain registrars, in the course of obtaining services that support the Defendants' Thallium infrastructure, are the most accurate and viable contact information and means of notice and service. Indeed, the physical addressees provided by Defendants to domain registrars and other service providers are false and Defendants' whereabouts are unknown, and are not ascertainable despite the exercise of diligent

formal and informal attempts to identify the Defendants, which further supports service by email and publication. *See BP Products North Am., Inc.,* 236 F.R.D. at 271. Moreover, Defendants will expect notice regarding their use of the domain registrars' services to operate their Thallium infrastructure by email, as Defendants agreed to such in their agreements with the service providers who provided the domains for Defendants' use. *See Nat'l Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311 (1964) ("And it is settled … that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether.").

Given the circumstances and Plaintiff's diligent efforts to locate Defendants, Due Process has been satisfied by Plaintiff's service by publication and multiple email notices.

**B.   Default Judgment Is Appropriate**

All of the relevant considerations point towards issuance of a default judgment against Defendants. *Compare Tweedy*, 611 F. Supp. 2d at 605-606 (applying default factors). First, the amount of money at stake weighs in favor of default judgment because Plaintiff is not requesting any monetary relief, and indeed it is not possible for Plaintiff to obtain any meaningful monetary relief under the circumstances. Accordingly, default judgment poses no risk of undue cost, prejudice, or surprise to Defendants.

Second, there are no material facts in dispute. Plaintiff has put forth a strong factual showing supported by expert testimony, forensic evidence, and documentary evidence from researchers who have studied the Thallium infrastructure and its impact on victims. The allegations and evidence in the detailed Complaint and otherwise in the record establish that the Defendants' conduct in operating the Thallium infrastructure violated and are likely in the future to violate the Computer Fraud and Abuse Act (18 U.S.C. § 1020), Electronic Communications

Privacy Act (18 U.S.C. § 2701), the Lanham Act (15 U.S.C. §§ 1114, 1125), the Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)), and the common law of trespass to chattels, conversion, and unjust enrichment.

Third, this case involves a matter of substantial public importance.  Defendants are perpetrating serious offenses and civil torts that cause substantial harm to hundreds if not thousands of victims.  In addition to the general public interest in abating such harm, the public also has a strong interest in the integrity and enforcement of federal laws designed to deter cybercrime and enhance data security.

Fourth, default here is not merely technical.  This is not a situation where Defendants have accidentally missed a deadline by a few days.  Nor is default the result of a good faith mistake or excusable neglect.  Rather, Defendants have affirmatively chosen not to appear and defend this action, despite ample notice and opportunity to do so.  Plaintiff has made extraordinary efforts over the course of many months to ensure that Defendants were provided notice, and the evidence indicates that Defendants are actually aware of this action, but affirmatively choosing not to appear.

Fifth, Plaintiff and other victims of the Thallium infrastructure have been prejudiced by the Defendants' actions and omissions.  Defendants have refused to make their identities known and have refused to participate in this lawsuit.  Defendants' disregard for this Court's process and refusal to communicate have caused Plaintiff to incur significant expense.

Finally, the grounds offered for the entry of a default judgment are clearly established. Plaintiff's application for Default and supporting declaration establish that Defendants have been served.  Moreover, the detailed Complaint and the record as a whole establishes Defendants' unlawful conduct and the harm it has caused.

C.     **Plaintiff Has Adequately Pled Each Of Its Claims**

The Complaint alleges that Defendants have violated the Computer Fraud and Abuse Act

("CFAA") (18 U.S.C. § 1020), Electronic Communications Privacy Act (18 U.S.C. § 2701)

("ECPA"), the Lanham Act (15 U.S.C. §§ 1114, 1125), the Anticybersquatting Consumer

Protection Act (15 U.S.C. § 1125(d)) ("ACPA"), and the common law doctrines of trespass to

chattels, conversion, and unjust enrichment.  Each of these claims is adequately pled.

**CFAA Claim.**  The CFAA penalizes a party that: (1) intentionally accesses a protected

computer  without authorization, and as a result of such conduct, causes damage, 18 U.S.C. §

1030(a)(5)(C); or (2) intentionally accesses a computer without authorization or exceeds

authorized access, and thereby obtains information from any protected computer, 18 U.S.C. §

1030(a)(2)(C); or (3) knowingly causes the transmission of a program, information, code, or

command, and as a result of such conduct, intentionally causes damage to a protected computer,

18 U.S.C. § 1030(a)(5)(A).  A "protected computer" is a computer "used in interstate or foreign

commerce or communication." *E.g., SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 608

(E.D. Va. 2005).  The phrase "exceeds authorized access" means "to access a computer with

authorization and to use such access to obtain or alter information in the computer that the

accesser is not entitled to obtain or alter." *Id.* (citing 18 U.S.C. § 1030(e)(6)).  To prosecute a

civil claim under the CFAA, a plaintiff must demonstrate loss or damage in excess of $5,000.

The Complaint alleges that Defendants have surreptitiously accessed protected computers

by infecting the computers with malware and then using the Thallium infrastructure to control

victim computers and to misappropriate confidential, sensitive and high-value information.  Dkt.

1, ¶¶ 21-34, 35-40.  The Complaint alleges damage of more than $5,000 dollars.  *Id.* ¶¶ 35-40.

Accordingly, Plaintiff has properly alleged a CFAA claim and is entitled to default judgment on

this claim.  Defendants conduct is precisely the type of activity the CFAA is designed to prevent.

*See e.g. Global Policy Partners, LLC v. Yessin*, 2009 U.S. Dist. LEXIS 112472, *9-13 (E.D. Va.

2009) (accessing computer using credentials that did not belong to defendant was actionable

under the CFAA); *Facebook, Inc. v. Fisher*, 2009 U.S. Dist. LEXIS 122578 (N.D. Cal. 2009)

(CFAA violation where defendants allegedly engaged in a phishing and spamming scheme that

compromised the accounts of Facebook users); *Physicians Interactive v. Lathian Sys., Inc.*, 2003

U.S. Dist. LEXIS 22868, *25 (E.D. Va. 2003) (CFAA violation where the defendant hacked into

a computer and stole confidential information); *Microsoft Corp. v. Doe*, 2015 U.S. Dist. LEXIS

109729 (E.D. Va. Aug. 17, 2015) (O'Grady, J.) (CFAA violation for operating botnet); *Microsoft

Corp. v. Doe*, 2014 U.S. Dist. LEXIS 46951 (E.D. Va. Apr. 2, 2014) (Brinkema, J.) (same).

       **ECPA Claim.**  The ECPA prohibits "intentionally access[ing] without authorization a

facility through which electronic communications are provided" or doing so in excess of

authorization, and, in so doing, obtaining, altering, or preventing authorized access to an

electronic communication while it is in electronic storage.  18 U.S.C. § 2701(a).  Persons injured

by violations of the ECPA may bring a civil suit to obtain injunctive relief and damages.  *E.g.*,

*DIRECTV, Inc. v. Benson*, 333 F. Supp. 2d 440, 449 (M.D.N.C. 2004).

       The Complaint alleges that Plaintiff's servers and its licensed operating system at end

user computers are facilities through which electronic communication services are provided.

Dkt. 1, ¶¶ 21-34, 41-46.  Defendants' conduct in operating Thallium violates the ECPA because

Defendants break into computing devices and computer networks with the direct intention of

acquiring the contents of sensitive communications be they e-mails, voice mails, or other

communications types.  *Id.*  Defendants use software, installed without authorization on

compromised computers to do so.  *Id.*  Obtaining stored electronic information in this way,

without authorization, is a violation of the Electronic Communications Privacy Act.  *See Global Policy Partners, LLC*, 686 F. Supp. 2d 631, 635-637 (E.D. Va. 2009) (unauthorized access to emails was actionable under ECPA); *State Analysis, Inc. v. American Fin. Srvcs. Assoc.*, 621 F. Supp. 2d 309, 317-318 (E.D. Va. 2009) (access of data on a computer without authorization actionable under ECPA).  Hacking into a computer and intercepting Internet communications clearly violates the ECPA.  *See, e.g., Sharma v. Howard County*, 2013 U.S. Dist. LEXIS 18890, 19 (D. Md. Feb. 12, 2013).  Accordingly, Plaintiff properly alleged an ECPA claim and default judgment on this claim is warranted.

**Lanham Act Claims.**  Section 1114(1) of the Lanham Act prohibits use of a reproduction, counterfeit, copy or "colorable imitation" of a registered mark in connection with the distribution of goods and services where such use is likely to cause confusion or mistake or to deceive.  *See e.g. George & Co., LLC, v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009) (citing 15 U.S.C. § 1114(1)(a)).  Here, the Complaint alleges that Defendants use Microsoft's registered, famous and distinctive trademarks in Internet domains designed to deceive victims into clicking on the links in emails and to blend in with normal network traffic, when those domains are being used to unlawfully send commands to victim computers or exfiltrate sensitive stolen data.  In this way, Defendants deceive victims, cause them confusion and cause them to mistakenly associate Microsoft with this activity.  Dkt. 1, ¶¶ 24-30, 47-52. Defendants' conduct also constitutes false designation of origin under section 1125(a), causing confusion and mistakes as to Plaintiff's affiliation with Defendants' malicious conduct.  *See, e.g., Brookfield Commc'ns.,* 174 F. 3d at 1066-67 (entering preliminary injunction under Lanham Act §1125(a) for infringement of trademark in software and website code).  The Complaint alleges this Lanham Act violation in detail as well.  Dkt. 1, ¶¶ 53-63.  Thus, Plaintiff properly alleged

these Lanham Act claims and default judgment is warranted.

**ACPA Claim.** ACPA prohibits a defendants from (1) registering, trafficking in, or using a domain name; (2) that was identical or confusingly similar to a mark owned by Plaintiff; (3) that such mark was distinctive at the time Defendants registered the domain name; and (4) Defendants did so with a bad faith intent to profit from such mark. *Zinner v. Olenych*, 108 F. Supp. 3d 369, 379 (E.D. Va. 2015). Here, the Complaint alleges that Defendants use Microsoft's registered, famous, and distinctive trademarks in many domains they have registered. Dkt. 1, ¶¶ 24-30. For example, Microsoft's registered, famous, and distinctive trademarks include "Microsoft," "Windows," "Outlook," "Hotmail," "MSN," and "Office365," among others. Dkt. 1. The Complaint establishes that Defendants have acted in bad faith with the intent to profit from Microsoft's trademarks. Defendants have no trademark or IP rights in the domain names; the domain names do not consist of a name used to identify Defendants; Defendants have not used the domain name in connection with the bona fide offering of any goods or services; Defendants use of the domains to exfiltrate sensitive information from a victim's network harms the goodwill represented by Microsoft's trademarks; Defendants used false information to register the domains; and Defendants registered multiple domains that incorporate Microsoft's distinctive marks. *See id.* These factors demonstrate an ACPA violation. *See Zinner*, 108 F. Supp. 3d at 387-88. Accordingly, Plaintiff properly alleged an ACPA claim and default judgment on this claim is warranted.

**Tort Claims.** Under Virginia law, the tort of conversion "encompasses any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (Va. 1994)

(quotation omitted).  The related tort of trespass to chattels applies where "personal property of another is used without authorization, but the conversion is not complete."  *Dpr Inc. v. Dinsmore*, 82 Va. Cir. 451, 458 (Va. Cir. Ct. 2011) (citations omitted).  Here, the Complaint establishes that Defendants exercised dominion and authority over Plaintiff's proprietary Windows software by injecting code that fundamentally changed important functions of the software, converted Plaintiff's property, and were unjustly enriched with ill-gotten benefits reaped from the Thallium infrastructure and its victims.  Dkt. 1 at ¶¶ 77-95.

The well-pled allegations in Plaintiff's Complaint, which set forth the elements of each of Plaintiffs claims, are taken as true given Defendants default.  *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005).  Accordingly, the only question is what remedy to afford Plaintiff.

### D.     A Permanent Injunction Should Issue To Prevent Further Irreparable Harm

A permanent injunction is appropriate where: (1) plaintiff has suffered an irreparable injury; (2) remedies available at law (e.g. monetary damages), are inadequate to compensate for that injury; (3) considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *See EMI April Music, Inc. v. White*, 618 F. Supp. 2d 497, 509 (E.D. Va. 2009) (citing *Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007)).

### 1.     Plaintiff Has Suffered And Is Likely To Suffer Irreparable Injury That Cannot Be Compensated Monetarily

Consumer confusion and injury to business goodwill constitute irreparable harm.  *See, e.g., PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011) (false and misleading representations constituted irreparable harm, and warranted permanent injunction); *Int'l Labor Mgmt. Corp. v. Perez,* 2014 U.S. Dist. LEXIS 57803, 35 (M.D.N.C. Apr. 25, 2014) (damage to "reputation and loss of goodwill constitutes irreparable harm for purposes of

injective relief") (citing *In Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994)); *MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, 726 F. Supp. 2d 604, 635 (W.D. Va. 2010) ("The loss of goodwill is a well-recognized basis for finding irreparable harm"). A finding of irreparable harm usually follows a finding of unlawful use of a trademark and a likelihood of confusion. *Ledo Pizza Sys. v. Singh*, 2013 U.S. Dist. LEXIS 146938, 9 (D. Md. Oct. 10, 2013); *Nabisco Brands, Inc. v. Conusa Corp.*, 722 F. Supp. 1287, 1290 (M.D.N.C. 1989) ("In the context of a trademark infringement dispute, several courts have held that where likelihood of confusion is established likelihood of success on the merits as well as risk of irreparable harm follow."). The Court previously found that the harm caused to Plaintiff by the Thallium operations, including through computer intrusions and the confusing and misleading use of Microsoft trademarks and brands, constitutes irreparable harm. Dkt. 19 at ¶¶ 3-5. To the extent that Defendants are able to continue to use domains to carry out computer intrusions against Microsoft and its customers or use domains bearing Microsoft's trademarks and brands in furtherance of their activities, such irreparable harm would certainly continue in the future.

This finding is consistent with several cases that have concluded that computer malware operations and associated use of Microsoft's trademarks cause irreparable harm. *See, e.g., Microsoft Corp. v. Peng Yong et al.*, Case No. 1:12-cv-1004-GBL (E.D. Va. 2012) (Lee, J.) (injunction to dismantle botnet command and control servers); *Microsoft v. Piatti, et al.*, Case No. 1:11-cv-1017 (E.D. Va. 2011) (Cacheris, J.) (injunction to dismantle botnet command and control servers); *Microsoft Corporation v. John Does 1-27*, Case No. 1:10-cv-156 (E.D. Va., Brinkema J.) (same); *Microsoft v. John Does 1-11*, Case No. 2:11-cv-00222 (W.D. Wa. 2011) (Robart, J.) (same); *Microsoft Corp. et al. v. John Does 1-39 et al.*, Case No. 12-cv-1335

(E.D.N.Y. 2012) (Johnson, J.) (same); *FTC v. Pricewert LLC et al.*, Case No. 09-2407 (N.D. Cal. 2009) (Whyte J.) (injunction disconnecting service to botnet hosting company).

In addition to the irreparable harm caused to Plaintiff's goodwill, even the monetary harm caused by Defendants is and will be irremediable absent an injunction because Defendants are elusive cybercriminals whom Plaintiff is unlikely to be able to enforce a judgment against. *See, e.g., Khepera-Bey v. Santander Consum. USA, Inc*., 2013 U.S. Dist. LEXIS 87641, 13-14 (D. Md. June 21, 2013) ("circumstances[] such as insolvency or unsatisfiability of a money judgment, can show irreparable harm."); *accord Burns v. Dennis-Lambert Invs., Ltd. P'ship*, 2012 Bankr. LEXIS 1107, 9 (Bankr. M.D.N.C. Mar. 15, 2012) ("a preliminary injunction may be appropriate where 'damages may be unobtainable from the defendant because he may become insolvent before final judgment can be entered.'"); *Rudolph v. Beacon Indep. Living LLC*, 2012 U.S. Dist. LEXIS 7075, 5 (W.D.N.C. Jan. 23, 2012) ("Irreparable harm exists here because of Defendant Beacon's continued occupancy of the Facility without paying any rents, particularly in light of the threat of insolvency by one or more Defendants.").

## 2.     The Balance Of Hardships Overwhelmingly Favors An Injunction

Because Defendants are engaged in an illegal scheme to defraud computer users and injure Plaintiff, the balance of equities clearly tips in favor granting an injunction. *See, e.g., PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011) (where defendant had no legitimate interest in "perpetuating the false and misleading" representations, balance of equities warranted injunction); *US Airways, Inc. v. US Airline Pilots Ass'n,* 813 F. Supp. 2d 710, 736 (W.D.N.C. 2011) (injunction appropriate where, in balance of the equities, denying injunction would result in "enormous disruption and harm" to plaintiff and the public, granting injunction would only require defendant to comply with existing legal duties); *Pesch v. First City*

*Bank of Dallas,* 637 F. Supp. 1539, 1543 (N.D. Tex. 1986) (balance of hardships clearly favors injunction where enjoined activity is illegal).  On one side of the scales of equity rests the harm to Plaintiff and its customers caused by the Defendants' ongoing Thallium operation, including ongoing deceptive use of Plaintiff's trademarks and brands in the Thallium domains.  By contrast, on the other side rests no legally cognizable harm to Defendants because an injunction would only require them to cease illegal activities.  For this reason, an ongoing permanent injunction is appropriate.  *See US Airways,* 13 F. Supp. 2d at 736.

### 3.    An Injunction is in the Public Interest

The public interest is clearly served by enforcing statutes designed to protect the public, such as the Lanham Act, CFAA, and ECPA.  *See, e.g.*, *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011) (preventing false or misleading representations constitutes a "strong public interest" supporting permanent injunction); *Microsoft Corp. v. Doe*, 2014 U.S. Dist. LEXIS 48398, 32 (E.D. Va. Jan. 6, 2014) (public interest weighed in favor of injunction to enforce CFAA); *BSN Med., Inc. v. Art Witkowski*, 2008 U.S. Dist. LEXIS 95338, 10 (W.D.N.C. Nov. 21, 2008) ("In a trademark case, the public interest is 'most often a synonym for the right of the public not to be deceived or confused.' . . .the infringer's use damages the public interest.") (citation omitted); *Dish Network LLC v. Parsons,* 2012 U.S. Dist. LEXIS 75386, 8-9 (W.D.N.C. May 30, 2012) (public interest weighed in favor of injunction to enforce ECPA).

Here, Plaintiff requests an injunction that will transfer permanent control of the existing Thallium domains to Microsoft and requests appointment of the Court Monitor to oversee Defendants' ongoing compliance with the permanent injunction, including the authority to issue orders to disable and transfer new malicious domains that are put into operation by Defendants. As a result of such injunction, Microsoft will be able to protect itself and its customers from the

threat of Defendants operations and can continue to assist victims in cleaning infected

computers.  Absent the requested injunction, the Defendants' existing infrastructure would be

released back into Defendants' control, Defendants would be able to establish new malicious

domains and associated infrastructure with impunity, and Defendants would be able to use that

infrastructure to deceive computer users, issue instructions to infected computers, take control

over them, and exfiltrate high value, sensitive and confidential information.

Given the risks the public will face absent an injunction, the calculus is clear.  There is no

risk that the injunction will impact any legitimate interest of any party.  Neither Defendants nor

any other party has come forward to assert any undue impact by Microsoft's control of the

existing Thallium domains or the Court Monitor's authority and orders disabling new Thallium

domains that have been put into place over the course of this action.  In particular, the third-party

domain registries responsible for administering the Thallium defendants' domains must simply

carry out routine actions that they would take in the ordinary course of their business, namely

transferring the domains to the permanent control of Plaintiff.

Directing such routine actions and reasonable cooperation to vindicate the public's

interest, and ensure that the permanent injunction is not rendered fruitless, is authorized by the

All Writs Act (28 U.S.C. § 1651(a) and the Court's equitable authority), will not offend Due

Process, does not interfere with normal operations, does not deprive any third party of any

property interest and requires Microsoft to compensate the third parties for the assistance

rendered.[1]  Indeed, Plaintiff has conferred with relevant domain registries and they have no

---

[1] The All Writs Act provides that a court may issue all writs necessary or appropriate for the administration of justice.  28 U.S.C. § 1651(a); *see United States v. New York Tel. Co*., 434  U.S. at 174 (authorizing order to third-party telephone company to assist in implementation of a pen register warrant); *Microsoft Corp. v. Doe*, 2014 U.S. Dist. LEXIS 48398, 30 (E.D. Va. Jan. 6, 2014) (authorizing relief similar to that requested herein); *United States v. X,* 601 F. Supp. 1039, 1042 (D. Md. 1984) (order to a third party to provide "nonburdensome technical assistance");

objection to the requested relief.

4.     **An Ongoing Process Is Needed To Efficiently And Effectively Curtail Defendants' Efforts To Rebuild Thallium's Command And Control Infrastructure**

Plaintiff seeks, particularly, as part of the permanent injunctive relief, a streamlined procedure, assisted by a proposed court-appointed monitor—Hon. S. James Otero (Ret.)—to respond to new malicious domains registered by Defendants in violation of the injunction, as set forth more fully in the Proposed Default Judgment and Order for Permanent Injunction submitted with this motion.

Defendants are persistent in their activities and are likely to attempt to maintain, rebuild, and even grow, their capabilities again and again. Plaintiff will, as it has up until now, monitor Defendants' activities, identify new Thallium command and control domains associated with Microsoft's trademarks or brands ("Thallium Domains") as they are activated. Indeed, as discussed above, Defendants have continued to put into operation new Thallium Domains throughout the course of this case, and the only process that has allowed those domains to be immediately disabled, stopping the harm, is the Court Monitor's oversight of the existing injunctions. Defendants have even demonstrated willful violation of the Court's prior orders by registering new harmful domains, to deceive victims. Consequently, Plaintiff and the Court face the nearly certain prospect that enforcing the Court's permanent injunction will require

---

*Moore v. Tangipahoa Parish Sch. Bd.*, 507 Fed. App'x. 389, 396 (5th Cir. 2013) (unpublished) ("The All Writs Act provides 'power to a federal court to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'") (citing *New York Tel. Co.*, 434 U.S. at 172); *In re Application of United States for an Order Authorizing An In-Progress Trace of Wire Commc'ns Over Tel. Facilities*, 616 F.2d 1122, 1129 (9th Cir. 1980) (same); *In re Baldwin-United Corp.*, 770 F.2d 328, 338-339 (2d Cir. 1985) ("An important feature of the All-Writs Act is its grant of authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction").

continuously re-opening the case and multiple ongoing rounds of motion practice and amendments to the list of command and control domains subject to the Court's permanent injunction and multiple new proceedings.  Failing this sustained effort, Defendants will continue their malicious and illegal activities, causing irreparable injury to Plaintiff, its customers and the public.  *See e.g.,* Anselmi Decl., ¶ 14 (describing likelihood that Defendants will continue harmful activities absent an ongoing process to disable Defendants' malicious domains).

However, Plaintiff acknowledges the burden that such a sustained effort will place on the Court.  Plaintiff therefore respectfully submits that the Court incorporate into the permanent injunction a streamlined procedure to efficiently and effectively supplement the list of domains subject to the Court's permanent injunction as soon as Defendants activate the new domains.  This process has been in place in another similar matter in this Court since December 2016 and it has been effective in promptly enforcing the Court's prior injunctions, disabling new malicious infrastructure and mitigating the injury caused by that infrastructure. *See Microsoft v. John Does 1-2*, 1:16-cv-00993-LO-TCB, Dkts., 60, 68-69, 72-77.

In brief, Plaintiff requests and recommends that the Court appoint as a Court Monitor, the Honorable S. James Otero (Ret.), pursuant to Federal Rule of Civil Procedure 53, to manage this process and relieve the burden on the Court.  The availability of a Court Monitor to oversee this process also will increase the effectiveness of the Court's permanent injunction order, as it will enable more prompt, continuous response to Defendants' continued violation of any permanent injunction.  The Court Monitor will make determinations on any disputes between Plaintiff, any Defendant, registry or other third party, regarding disabling of Thallium Domains as set forth in the Proposed Default Judgment and Order for Permanent Injunction submitted with this motion. The Court Monitor will further determine (based on evidence submitted by Microsoft) whether

Defendant is violating the permanent injunction, will determine whether additional particular domains are in fact being used by Defendants as part of Thallium and may order that such new domains be added to the list of domains subject to the Court's permanent injunction.

Under Federal Rule of Civil Procedure 53(a)(1)(C), a court may appoint a court monitor to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."  A court monitor is necessary here because it will impose an undue burden on the court's limited time and resources to rule on what are expected to be continuous and potentially frequent motions to amend the permanent injunction every time that Defendants register and use new Thallium Domains leveraging Microsoft trademarks.  This is especially the case considering the ease and speed with which Defendants are currently registering malicious domains to continue their attacks, throughout the course of this case.  Further, the ability of a court monitor to make determinations on such matters will increase the effectiveness of the Court's permanent injunction and permit enforcement of Defendants' compliance on an ongoing basis.

Courts have frequently made use of court-appointed monitors and other masters in cases such as this one, where ongoing compliance with the court's permanent injunction is at issue and supervision would be too time-consuming or difficult for the court to undertake without assistance.  *See e.g.*, *Microsoft v. John Does 1-2*, 1:16-cv-00993-LO-TCB, Dkts., 60, 68-69, 72-77; *Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, No. 2:13-21588, 2016 U.S. Dist. LEXIS 73904, at *50 (S.D. W. Va. June 7, 2016) ("Appointing a special master is proper in this case because the proposed injunctive relief includes complex analysis and implementation of environmental engineering plans and monitoring to correct [defendant's] violations."); *Sledge v. J.P. Stevens & Co., Civil No. 1201.*, 1976 U.S. Dist. LEXIS 16422, at *29 (E.D.N.C. Feb. 27,

1976) (Appointing a Special Master to administer the Court's Decree and to hear and determine instances of possible non-compliance); *Schaefer Fan Co. v. J & D Mfg., Inc.*, 265 F.3d 1282 (Fed. Cir. 2001) (Appointing special master to resolve disputes and issue decisions regarding compliance with settlement agreement); *Evans v. Fenty*, 701 F. Supp. 2d 126, 129 (D.D.C. 2010) (Special Masters assisted court by making findings and recommendations that addressed the status of defendants' compliance and available options for curing the identified deficiencies); *see also* 18 U.S.C. § 1836(b)(2)(D) (providing that special masters may be appointed to locate and isolate trade secret information from other property).

As the first step in the streamlined process in the proposed permanent injunction, Plaintiff will monitor Defendants' activities and will identify new Microsoft-related Thallium Domains as Defendants activate them. Making an accurate identification is important, and Plaintiff will base its conclusions on a set of criteria developed over the course of its lengthy investigation into Defendants and Thallium. Anselmi Decl., ¶¶ 6-13. The following are factors Plaintiff considers within its framework, which are currently set forth and considered pursuant to the process in the preliminary injunction (Anselmi Decl.):

1. ***Presence of Distinctive Malware***: Defendants typically use a relatively small set of distinctive malware that can be distinguished from other types of malware. *Id.* ¶ 8. The specific types of malware known to be used by Defendants is listed in the attached Proposed Default Judgment and Order for Permanent Injunction. If the malware used in a new attack matches or is a similar variant of the distinctive malware used by the Defendants in past attacks, it indicates that the actors behind the new attack are the Defendants. *Id.* Because Thallium malware is reasonably distinctive, domains that are used to deliver the Thallium malware to targeted victims or communicate with the already-installed Thallium malware are strongly implicated as Thallium domains. *Id.* The presence of this distinctive malware therefore serves as a reliable indicator that Defendants are using an Internet domain. *Id.*

2. ***Pattern in Domain Registration***: If the registration information associated with a newly identified Internet domain closely matches the pattern associated with the domains registered by the Defendants in the past, it is a strong indicator that the Defendants are behind the registration of the new domain. *Id*, ¶ 9. Plaintiff has

identified patterns in the registration information provided by Defendants when registering the domains used in their illegal activities.  *Id.*  Plaintiff considers such things as the email address and phone number provided by the registrant, the hosting service designated, the name servers used, the IP address(es) and other technical details associated with the domain.  *Id.*  Exemplary registration information associated with Internet domains registered by Defendants in the past is included in Appendix A to the Proposed Default Judgment and Order for Permanent Injunction submitted with this motion.

3. ***Tactics Used During a New Attack***:  Where the tactics used in a new attack match the tactics favored by Thallium Defendants in past attacks, it is an indication that the Defendants are behind the new attack.  *Id*, ¶ 10.  For example, Thallium Defendants often send phishing emails to victims in which the email purports to be a notification from Microsoft regarding an unauthorized access to the recipients' Microsoft account, and requesting that she or he "Login," or "Validate Account" or "Reset Password." *Id.*  If the victim clicks on the embedded button in the phishing email, the victim will be connected to a Thallium-controlled website which will attempt to induce the victim to enter his account credentials.  *Id.*  Other tactics favored by the Thallium Defendants include remote code execution through browser drive-by, remote code execution through malicious attachments, privilege escalation or sandbox escape, security feature bypass, social engineering based attack and/or bootstrapped add-on. *Id.*

4. ***Specific Targeted Victims***:  The Thallium Defendants tend to target a particular type of victim and attempt to steal particular types of information.  *Id.*, ¶ 11.  Therefore, Plaintiff can use information about the intended victim to help determine whether or not Defendants are involved in the new attack.  *Id.*  For example, Thallium continues to target organizations that work on Nuclear Proliferation issues, think tanks, university staff members, members of organizations that attempt to maintain world peace, and human rights organizations.  *Id.*  Where an Internet domain is associated with an attack on these particular types of targets or previously targeted organizations, it is a factor that is consistent with the known activity and objectives of the Defendants.

5. ***Use of General Terms Suggestive of Microsoft's Services and Use of Microsoft Marks and Brands or Confusingly Similar Variants***:  The use of general terms suggestive of Microsoft's services and use of Microsoft trademarks and brand names or slight misspellings or variants of those trademarks or brand names in some manner, alone or in combination with other terms, is an indicator that the domain is associated with Thallium.  *Id.*, ¶ 13.  For example, Defendants use such marks in content presented on malicious websites, in domain names or in registry keys associated with their malware.  *Id.*  Defendants use this technique to disguise the illegal nature of their conduct from the intended target.  *Id*.

Under Plaintiff's proposal, when Plaintiff determines that Defendants have activated a

new Thallium Domain, the disposition of that domain is as follows.  With respect to domains that

are alleged to meet the criteria to constitute Microsoft-related Thallium Domains, and domains that are alleged to be Thallium Domains based on new criteria, Plaintiff shall submit a written motion to the Court Monitor seeking a declaration that such domains are Thallium Domains. The Court Monitor shall take and hear evidence and shall make determinations and issue orders whether domains are Thallium Domains, again, subject to the right to judicial review.  This is the same process that has been in place since December 2016 in another case addressing similar matters, and it has been effective in that matter.  *Microsoft v. Does 1-2*, 1:16-cv-00993-LO-TCB, Dkts., 49, 60, 68-69, 72-77.

Plaintiff believes that this process will reduce the burden on the Court, better ensure enforcement of the Court's permanent injunction, provide for efficient reaction against Defendants as they attempt to activate new domains for illegal ends, and provide an adequate mechanism for registries, third-parties, or Defendants to challenge the substance and process concerning enforcement of the permanent injunction.  Thus, the appointment of a court monitor in this case is appropriate under Federal Rule of Civil Procedure 53(a)(1)(C).

If the Court is amenable to appointment of a Court Monitor to oversee ongoing enforcement of the permanent injunction, Plaintiff respectfully requests that the Court continue the appointment of the Honorable S. James Otero (Ret.).  Judge Otero has relevant legal and technical expertise based on other matters involving complex technology and intellectual property issues, and has served in the capacity as a neutral special master in prior matters.  Any Court Monitor must establish that there are no conflicts of interest and provide an affidavit "disclosing whether there is any ground for disqualification under 28 U.S.C. § 455."  A declaration of the foregoing candidate establishing suitability for the role of Court Monitor, including current curriculum vitae, is submitted with this motion, for the Court's consideration.

Declaration of Hon. S. James Otero (Ret.) (Ex. 2).

**V.**     <u>**CONCLUSION**</u>

For the reasons set forth in this brief, and based on the Complaint, the evidence submitted in this case and the Court's prior orders, Plaintiff respectfully requests that the Court grant Microsoft's Motion for Default Judgment and Permanent Injunction.

Dated:  October 15, 2020

Respectfully submitted,

*/s/ Julia Milewski*

Julia Milewski (VA Bar No. 82426)
David O'Brien (VA Bar No. 14924)
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington DC 20004-2595
Telephone:  (202) 624-2500
Fax:            (202) 628-5116
jmilewski@crowell.com
dobrien@crowell.com

Gabriel M. Ramsey (*pro hac vice*)
Kayvan Ghaffari (*pro hac vice*)
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Telephone:  (415) 986-2800
Fax:            (415) 986-2827
gramsey@crowell.com
kghaffari@crowell.com

Richard Domingues Boscovich (*pro hac vice*)
MICROSOFT CORPORATION
One Microsoft Way
Redmond, WA 98052-6399
Telephone: (425) 704-0867
Fax:            (425) 936-7329
rbosco@microsoft.com

*Attorney for Plaintiff Microsoft Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2020, I will electronically file the foregoing with

the Clerk of Court using the CM/ECF system.  Copies of the forgoing were also served on the

defendants listed below by electronic mail:

**John Does 1-2**

tang_guanghui@hotmail.com
bitcoin024@hanmail.net
bitcoin025@hanmail.net
satoshiman0088@gmail.com
noreplygooqlesender@gmail.com
pigcoin2020@hotmail.com
rninchurl@daum.net
tiger199392@daum.net
infornail.noreply@gmail.com
jiahuzong@hotmail.com
wusongha03@gmail.com
23f30d8e5ab4439fb15be24a7de1ffb8.protect@whoisguard.com
okonoki_masao@yahoo.co.jp
hello-0978@daum.net

*/s/ Julia Milewski*
Julia Milewski (VA Bar No. 82426)
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington DC 20004-2595
Telephone:  (202) 624-2500
Fax:          (202) 628-5116
jmilewski@crowell.com

*Attorney for Plaintiff Microsoft Corp.*